UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

FIRST SERVICE BANK PLAINTIFF

V. CIVIL ACTION NO: 1:24CV20

WORLD AIRCRAFT, INC., ET AL. DEFENDANTS

---

# TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE

BEFORE HONORABLE TAYLOR B. MCNEEL
UNITED STATES DISTRICT JUDGE

JANUARY 25, 2024

DAN M. RUSSELL, JR., UNITED STATES COURTHOUSE
GULFPORT, MISSISSIPPI

---

COURT REPORTER:

KATI VOGT, RPR, RMR, RDR, CRR
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI
2012 15TH STREET, SUITE 403
GULFPORT, MISSISSIPPI 39501
(228) 563-1780
KATI_VOGT@MSSD.USCOURTS.GOV

**A P P E A R A N C E S**

**(ALL PARTIES APPEARING TELEPHONICALLY)**

REPRESENTING THE PLAINTIFF:

EMERSON BARNEY ROBINSON, III, ESQ.
JOHN (JACK) A. CRAWFORD, JR., ESQ.
Butler Snow, LLP - Ridgeland
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157

PAUL S. MURPHY, ESQ.
Butler Snow, LLP - Gulfport
1300 25th Avenue, Suite 204
Gulfport, Mississippi 39501

REPRESENTING EL DORADO GAS & OIL, INC.:

PATRICK A. SHEEHAN, ESQ.
Sheehan & Ramsey, PLLC
429 Porter Avenue
Ocean Springs, Mississippi 39564

**THE COURT:** Good afternoon, everybody. This is Taylor McNeel. We are now on the record in this status conference in the matter of First Service Bank versus World Aircraft, Incorporated, et al, Civil Action Number 1:24CV20.

I'm about to ask everyone who is on the line to enter their appearances on the record; but before I do that, I want to make a couple of announcements. First, this is a status conference that is being held telephonically, and so there is a chance at times that the court reporter, who's sitting next to me, may not be able to take down everything that you say because portions of it could be unintelligible. And in lieu of me just interrupting you, as long as I'm getting the gist of what you're saying, I am not going to interrupt you, and so she may put in the transcript "unintelligible" for small portions of this transcript. Also, before you speak, once we get into the latter portions of this status conference, please identify yourself for purposes of record before you speak.

So with all of that being said, let's enter our appearances for the record. Let's begin with appearances on behalf of First Service Bank. Do we have anybody on the call who is representing First Service Bank?

**MR. CRAWFORD:** Yes, Your Honor. This is Jack Crawford with Butler Snow for First Service Bank, and I believe there'll be a couple other folks.

**MR. ROBINSON:** Your Honor, Barney Robinson, also with

Butler Snow, for the plaintiff.

**MR. MURPHY:** And, Your Honor, Paul Murphy with Butler Snow, also for First Service Bank.

**MR. SHEEHAN:** Your Honor, this is Pat Sheehan. I represent the applicant for intervention, El Dorado Gas & Oil, Incorporated, which is the debtor-in-possession under Chapter 11 bankruptcy.

**THE COURT:** Do we have anybody else on the call? All right. I don't hear anybody else on the call.

So the way I want to conduct this status conference is, first off, I have a number of questions. And then once I ask my questions and get the responses to those questions, I want the parties to have an opportunity to raise any issues that you would like to raise with me that have arisen over the last few days or that you would like for me to be made aware of.

So first question from me is to Mr. Sheehan. Mr. Sheehan, do you know who is going to be representing the defendants in this matter?

**MR. SHEEHAN:** No, I don't, Your Honor.

**THE COURT:** Do you know if Mr. Swarek has been made aware of this hearing or this status conference?

**MR. SHEEHAN:** I don't know that he has. I would suggest that he has not. He is aware of the lawsuit, though.

**THE COURT:** Okay. And I'm obviously -- my understanding, Mr. Sheehan, is you have represented Mr. Swarek,

and -- or at least you're representing El Dorado, but you have some relationship with Mr. Swarek, correct?

**MR. SHEEHAN:** I've represented entities owned by Mr. Swarek and controlled by Mr. Swarek. I have never represented him personally.

**THE COURT:** Okay. Now, I'm not going to get into communications that you feel are protected by attorney-client privilege in some other format, but do you know if Mr. Swarek is aware of these proceedings? My understanding is he has been served, but, I mean, just any other light that you can shed on that doesn't infringe upon any attorney-client communications in your role in representing El Dorado or some other entity, but just give me some flavor of Mr. Swarek's understanding of these proceedings and whether he's moving forward with getting counsel.

**MR. SHEEHAN:** Well, Jack Crawford emailed me pleadings that they would be filing, and I told Mr. Swarek at that time that -- that they had been filed, and I advised him that I couldn't represent him personally.

**THE COURT:** All right. So it's your understanding, Mr. Sheehan, that Mr. Swarek is obviously, at least in your view, going to need to obtain counsel that is not you, right?

**MR. SHEEHAN:** That's correct.

**THE COURT:** All right. Next line of questions, and this goes to plaintiff's counsel, those representing First

Service Bank. In light of Judge Wilson's order that was sent to me in the bankruptcy proceeding involving Hugoton Operating Company, Incorporated, in light of that agreed order that was sent to me that is Document Number 197 in that proceeding, what is the necessity, if any, of a TRO any longer?

**MR. CRAWFORD:** Thank you, Judge. This is Jack Crawford again with Butler Snow. The agreed order that was entered in both El Dorado Oil & Gas and -- or, I'm sorry, Gas & Oil and the Hugoton bankruptcy, that covers those two debtors' estates. We have -- separate and apart from those two bankruptcy estates, World Aircraft is a company that is not in bankruptcy and is not governed by that order, and Mr. Swarek is not governed by that order to the extent he has -- if he's moving or controlling assets that are -- that he contends are not of those two debtors, which is a problem that we intend to lay out for the Court of his moving assets around frequently.

**THE COURT:** Okay. And so in this proceeding, you attached to the complaint Document Number 6, which is a UCC that relates to World Aircraft. And in that UCC, there is a listing of a host of different assets. I did not count them all, but, I mean, there's approximately 300 or so. So are you saying that there's no overlap between these assets that are listed on this UCC and any of the assets in the two bankruptcy proceedings?

**MR. CRAWFORD:** Well, Your Honor, that's a -- that's a

complicated question to answer. So the bank's understanding and position is that those assets are owned by World Aircraft, which are separate and apart from the assets owned by El Dorado and Hugoton, which is why we are seeking -- in part, seeking the TRO here, is to keep those assets from being, you know, transferred or dissipated.

**THE COURT:** Okay.

**MR. CRAWFORD:** There is an allegation in -- and just in full disclosure to the Court, there's an allegation that Mr. Swarek moved monies out of a completely different entity that's also in Chapter 11, the Escambia estate's, and purchased assets in the name of World Aircraft and/or El Dorado, and so there's some question as to who owns what that will have to be fought out in the bankruptcy.

**THE COURT:** So in other words, if we move forward with a TRO hearing, it doesn't sound like that you're going to say with specificity, "Hey, Judge, these are assets that we know is owned by World Aircraft or owned by Swarek individually, and we are confident there's no overlap in the bankruptcy estates with these assets." It's more along the lines of, "Judge, we don't know, and we're just kind of belt-and-suspenders wanting another order." Is that fair?

**MR. CRAWFORD:** No, Your Honor, I think we'll say with confidence what it is we're asserting that we have a lien in that is owned by World Aircraft. I was just alerting the Court

to the fact that there may be other people that may assert that they have a right to some of it by lien.

**THE COURT:** Okay.

**MR. CRAWFORD:** Not by ownership.

**THE COURT:** All right. Well --

**MR. CRAWFORD:** And, Your Honor, one of the individuals that we listed is Drew McManagle (phonetic), who is the appointed Chapter 11 trustee in the Escambia estate's bankruptcies. He is the -- he is the person that is asserting the rights that they have -- that their estate has certain rights in some of the equipment of World Aircraft. He -- they are equally interested in getting an injunction put in place so that the assets don't disappear and is prepared to testify on behalf of First Service Bank in this proceeding in order to obtain the injunction. So that -- I just wanted to alert the Court to that. So it's not like we're seeking an injunction that would interfere with somebody else. The entity that it -- or the person that it would impact is here helping support us in this requested relief.

**THE COURT:** Okay. But I do have a question about that because in the specific relief that is being requested by FSB, you're requesting that the guarantors, World Aircraft and Mr. Swarek, be barred from secreting, rendering, irretrievable, or otherwise. So secreting, rendering, or irretrievable, I get that. But then you also request or otherwise attempting to

frustrate FSB's right to execute on the collateral at issue. So it seems like you're almost seeking -- so maybe explain to me. It seems like you're somewhat attempting through temporary restraining order to make sure that -- or get a court ruling that First Service Bank has the right to execute on all 300 of these assets.

**MR. CRAWFORD:** Well, Your Honor, I think the operative word is to "frustrate," is that he -- that we're seeking the Court to prevent Mr. Swarek from frustrating those efforts.

**THE COURT:** So you're not saying that Mr. Swarek couldn't raise defenses or those types of things. So what are you -- what would you mean by attempting to frustrate First Service Bank's right to execute that wouldn't just prohibit him from -- I mean, in other words, you're looking for some type of order that would prevent Mr. Swarek or World Aircraft from selling them or moving them or even using them in the -- in business?

**MR. CRAWFORD:** So, for example, frustration, he -- Mr. Swarek owns approximately 150 different companies. And so transferring some of the assets from World Aircraft to another entity and putting it -- entitling it in a different name and attempting to sell it without recognition of First Service Bank's lien rights would be an example. There's another example that Drew McManagle was going to touch on, I believe,

Your Honor, is the movement of assets out of the Escambia estate's bankruptcy after it was in bankruptcy, after the automatic stay and everything is in place, and then he moves assets out of it into another entity.

**THE COURT:** Okay. So Mr. --

**MR. CRAWFORD:** So we're not in any way saying that he can't raise a defense, but that he can't transfer or dissipate or, you know, hide assets from us.

**THE COURT:** Okay. What about using in the course of business?

**MR. CRAWFORD:** He would be able to use them, yes.

**THE COURT:** Okay. So really it's just -- what you're really seeking is he can't transfer them, he can't dissipate them. That's what you're primarily looking for.

**MR. CRAWFORD:** Yes, Your Honor, or hide them or ship them off to some other country.

**THE COURT:** Okay. All right.

Mr. Sheehan, you have filed a motion to intervene, and you say -- and I'm not looking to -- I'm not going to rule on this motion to intervene today. In fact, a magistrate judge may ultimately rule on that. But I am trying to understand the nature of this TRO request and when we should move forward with a TRO. And to that extent, of course, I note that you have filed a motion to intervene, and you say El Dorado claims an interest relating to property that is subject of this action

and is so situated that disposing of the action may, as a practical matter, impair or impede El Dorado's ability to protect its interests. So do you have anything else that you can expound upon that that may be relevant to the TRO?

**MR. SHEEHAN:** I intend to file a declaration that would be relevant to our intervention and would also be relevant to the TRO. Basically El Dorado purchased most of this equipment, and there are several orders in place here. One is the one that Your Honor referred to earlier. But that order already pertains to Mr. Swarek as the principal of El Dorado, and the other thing is it includes all of his affiliates. Any -- any company owned or controlled by Mr. Swarek is included in that order of the bankruptcy court.

And as to the Escambia case, there's an order in place in that case that does about the same thing. It says that any assets purchased with Escambia -- Escambia Operating Company money is declared to be property of Escambia Operating Company. And that case, that was another of Mr. Swarek's entities that went into -- went into a Chapter 11, and a trustee was appointed in that case in October, and that was Mr. McManagle. So he has an order in place protecting anything that was purchased by money of the company he's the trustee for, and that -- that covers the waterfront on anything Mr. McManagle would have. So I think the order is already in place.

It looks to us look they're trying to circumvent the

bankruptcy process and the remedies in the loan documents, which would be foreclosure as to the real property and replevin as to personal property, just so circumvent all that and come to the district court and ask for an order that may contradict the bankruptcy court order; understanding the priority of jurisdiction of the courts, but still, we want a place at the table here.

Now, having said all that, we don't object to this Court entering an order that tracks the orders in the bankruptcy court. We've agreed to that -- to that relief for all concerned. One of the things that does concern us is -- I'm reading from the memorandum, Document Number 3 filed by the plaintiffs -- the motion also seeks an order authorizing FSB to take immediate possession and control. That tells us they're trying to bypass foreclosure, bypass everything. What that would do is shut down an entity that is a debtor-in-possession that's operating almost a thousand oil wells in Texas. And if they take possession of the collateral, the collateral is everything El Dorado owns, then that would shut down oil fields, lay people off, and all kinds of things. So that's the reason we felt we had to intervene in this suit, to -- to have our say about that.

**THE COURT:** Yeah. Well, it sounded like from listening to Mr. Crawford that while that language may have been broad used in the brief, that ultimately, they weren't

really going to be seeking to execute on any collateral at this time, to take possession of any collateral at this time; that First Service Bank would be satisfied with an order that had more limited language that prevented the dissipation or the transferring or hiding of any of these assets that could be considered collateral of World Aircraft and not of the nature that you're talking about.

And I do want to point out, obviously, in this bankruptcy order from Judge Wilson that I'm looking at, it does mention the affiliated parties that are owned or controlled by Mr. Swarek. And, yes, it does seem that maybe World Aircraft could be considered one of those affiliated parties, but it also only references El Dorado debtors' estates or the property of the El Dorado debtors' estates, and it mentions property of the Hugoton debtors' estates. It doesn't mention property of World Aircraft. So it seems like there could be -- there could be some daylight between these orders. Is that fair, Mr. Sheehan?

**MR. SHEEHAN:** Well, Your Honor, World Aircraft is -- the stock in World Aircraft is owned a hundred percent by El Dorado, and that closes off any daylight once we make a showing of that to the Court.

**THE COURT:** Okay. Well, in terms of the necessity for a TRO hearing, it seems like the issues are being narrowed, though. Now, from El Dorado's standpoint, it doesn't sound --

it sounds like as long as First Service Bank isn't taking possession of collateral at this time and instead, there's language that tracks similar language from the bankruptcy orders and just makes it more specific to World Aircraft, it sounds like El Dorado may be fine with that. Of course, we don't have Mr. Swarek in this case at this time. But is that fair, Mr. Sheehan, that El Dorado generally would be fine with language that's similar to the bankruptcy court order language and as long as you just replaced it with World Aircraft?

**MR. SHEEHAN:** Absolutely, Your Honor. We have agreed to those -- to those terms in the other cases, and we would agree to it in this case. But I think there's -- you know, the way this is worded, the way -- it could be interpreted as a -- as an order that they could have immediate possession, and that -- that would damage us.

**THE COURT:** All right.

**MR. CRAWFORD:** Your Honor, there is -- you know, First Service Bank has a security interest duly perfected regarding Mr. Swarek's assets also. And so what we were seeking was this order to be entered to cover the World Aircraft assets and Mr. Swarek's individual assets that he has.

**THE COURT:** Okay. And that's just -- but I mean -- of course, when you're talking about -- I mean, you're talking about personal assets. I mean, how are you going to narrowly tailor that? Obviously he can still spend money and go to a

restaurant, those types of things. That would have to be more narrowly tailored, right?

**MR. CRAWFORD:** Well, I think it would be similar to the language of the World Aircraft order. I think it would cover both of them. And that is narrowly tailored.

**MR. SHEEHAN:** When you say World Aircraft order, I don't think there is one.

**MR. CRAWFORD:** That's what we're discussing.

**THE COURT:** Yeah, that's what -- I mean, Mr. Crawford is talking about how since Mr. Swarek is an individual guarantor, that Mr. Crawford is talking about what he would be requesting is a TRO that, you know, would also apply to Mr. Swarek and his individual assets since he is an individual guarantor. Of course, if it's a TRO, that's a temporary order.

So it seems like the most efficient use of resources is to see if everybody can get on the same page about what is agreeable to, because it doesn't make a lot of sense, if the issues are fairly narrow, to have an extensive hearing on a TRO and then you have to turn around and do it again at the preliminary injunction stage, potentially, especially if we don't have Mr. Swarek in the case yet; but that's something that can be addressed later on in this conference call. Regardless, it seems like these issues could be narrowed and somewhat of an agreement can be reached.

All right. Mr. Crawford, as to the urgency, you kind of

mentioned some things on this call that I don't think were in the complaint and weren't in the brief in support. From what I was seeing, as to the urgency, the urgency was almost exclusively based off this declaration of Jamie Cook, at least in the brief in support of TRO. Is there anything else that you were going to be putting forward in terms of evidence of urgency?

**MR. CRAWFORD:** Your Honor, we had -- the Jamie Cook affidavit was the thing that triggered the urgency, that -- that there was proof that things were being shipped and moved, or that was what Mr. Swarek was saying he was doing. That was what has triggered the urgency of it.

The Michael Graves deposition that's going on right now, he -- at least when I interviewed him, I have not been sitting in on the deposition, but when I interviewed him, he had indicated that he was aware and had been able to document that there was a significant amount of equipment that has been moved and transferred; but we'll have to get the deposition transcript to know exactly the scope of that.

**MR. SHEEHAN:** Well, Your Honor, as to the Michael Graves deposition, he said there was equipment moving -- moved from some of the yards in South Texas, but he also said he was told that it was being used on the wells in South Texas. And that's what they have the equipment there for, is to use on the wells. Like one day there'll be a thousand pieces of

equipment, and the next day, there'll be 800. They (unintelligible) to use it. I did say that on the -- on the Michael Graves deposition this morning.

**MR. MURPHY:** Your Honor, this is Paul Murphy with Butler Snow. Judge, I, too, sat in on that deposition this morning, and I can tell you that Mr. Graves also testified that he knew Mr. Swarek wanted to sell the assets without bank approval, and he recognized that as a concern. And once he did recognize that as a concern, he backed off and moved away from operating and working with Mr. Swarek.

In addition, Judge, he testified at length to the storage or what I'll say is the lack of climate controlled storage regarding this equipment, sitting out in atmosphere, moisture affecting it, affecting it in a negative way and not being maintained, and that, of course, is a concern as this is the collateral for First Service Bank.

**THE COURT:** Okay. I think that probably answers my questions.

Well, I have one other question. Mr. Sheehan, do you have contact information for Mr. Swarek? Email address? Phone number?

**MR. SHEEHAN:** Absolutely, I do.

**THE COURT:** Can you provide that soon after this call, later today?

**MR. SHEEHAN:** Could I provide it to the Court?

**THE COURT:** Yes.

**MR. SHEEHAN:** Yes, sir.

**THE COURT:** Okay. Because what I would like to do is I would like to schedule another status conference and have Mr. Swarek on the phone or have -- or give him the opportunity to get counsel before that phone call.

Now, now that I've had my questions responded to, any other issues that the parties want to raise?

From First Service Bank?

**MR. CRAWFORD:** No, Your Honor. I think as I understand our instructions, we'll work with Mr. Sheehan to see if we can nail down an agreeable order or at least narrow the issues between the parties.

**THE COURT:** Yes. Now, it seems like Mr. Sheehan certainly has the authority to do that on behalf of El Dorado. And I think these issues can be narrowed, and certainly -- I mean, I obviously know the lawyers on this call -- I think it's going to take some work, but y'all can reach an agreement on an order that is a standing order. Not just a temporary restraining order, but a standing order that would satisfy the parties.

Now, Mr. Sheehan, at least at this point in the litigation, my understanding is, only represents El Dorado, and it sounds like from Mr. Sheehan he doesn't have the authority or the ability to represent Mr. Swarek; at least that's his

view. So Mr. Swarek, before he signs off, is either going to have to sign off himself individually or have counsel sign off for him, which is why I want to try to track down Mr. Swarek and get him involved in these proceedings as soon as possible.

Anything else, Mr. Crawford?

**MR. CRAWFORD:** No, Your Honor.

**THE COURT:** Mr. Sheehan, anything else?

**MR. SHEEHAN:** No, sir.

**THE COURT:** Okay. All right. Well, that will conclude today's status conference. I appreciate your time. This was helpful in informing me on a number of issues.

Mr. Sheehan, my understanding is you're going to circulate that contact information for Mr. Swarek, and we will be in touch with Mr. Swarek to try to schedule an additional status conference potentially as soon as tomorrow, if not tomorrow, then early next week, to get everybody on the same page and to get Mr. Swarek at the table as well.

All right. That will conclude today's status conference, and court will stand in recess. Thank you.

(HEARING CONCLUDED.)

\- - -

CERTIFICATE OF COURT REPORTER

I, Kati Vogt, RPR, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings reported by me using the stenographic reporting method in conjunction with computer-aided transcription, which proceedings were held telephonically, to the best of my skill and ability.

Any unintelligibles, inaudibles, or audio gaps that occur within the transcript are a result of poor connection and/or audio quality, and I, as the court reporter, will not be held responsible for any audio gaps or unintelligible/inaudible portions of the record.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

s/ Kati Vogt, RPR, RMR, RDR, CRR
U.S. DISTRICT COURT REPORTER